UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

MARCO LEONEL MENDEZ,

Defendant.

Case No.:  24-cr-02430-JES-9

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS**

**[ECF Nos. 126, 159]**

## I.    INTRODUCTION

On December 2, 2024, Defendant Marco Leonel Mendez ("Mendez" or "Defendant") was arrested as part of a multi-year Drug and Enforcement Administration ("DEA") investigation. ECF No. 126 ("Mot. 1") at 1-7. Over the course of that investigation, Mendez had multiple contacts and conversations with law enforcement agents. *Id.* On February 28, 2025, Defendant filed a motion to suppress evidence challenging a search of his car following a traffic stop which occurred on May 18, 2023,

1

his subsequent statements to police after arrest, and statements he made to agents at the police station. Mot. 1 at 17. On March 21, 2025, the Government filed an opposition to the motion (ECF No. 140 ("Opp'n 1")), and Defendant filed a reply (ECF No. 141 ("Reply 1")). On May 30, 2025, Defendant filed a second motion to suppress, this time challenging statements made during a conversation in an agent's vehicle between federal agents and himself. ECF No. 159 ("Mot. 2"). On June 13, 2025, the Government filed an opposition to the motion (ECF No. 165 ("Opp'n 2")) and Defendant filed a reply (ECF No. 170 ("Reply 2")). Based on the papers filed and argument of counsel, the Court **GRANTS** in part and **DENIES** in part the motions to suppress.

## II.    FACTUAL BACKGROUND

### A. Background

Beginning in approximately October 2021, the DEA began investigating an alleged Mexican-based Drug Trafficking Organization ("DTO"). Opp'n 1 at 1-2. The DTO was suspected of importing kilogram quantities of narcotics, including heroin, methamphetamine, fentanyl, and cocaine, and then distributing the narcotics throughout the United States, largely using overnight delivery services. *Id.* at 2. During surveillance operations throughout the multi-year investigation, officers identified Luiscarlo Roldan ("Roldan") as one of the DTO's coordinators. *Id.*

On May 31, 2022, Roldan was observed meeting in the parking lot of an apartment complex with an individual, later determined to be Martin Cordova ("Cordova"), while Cordova's wife, Brenda Vanessa Calderon-Castro ("Calderon") stood nearby. *Id.* Cordova was seen with a red and black backpack and gave it to Roldan who placed the backpack into the trunk of his car and left. *Id.* During a records check, officers learned that Cordova had prior drug-trafficking convictions. *Id.* Eventually Roldan went to an Airbnb where investigators ultimately obtained a search warrant and located the backpack which contained a brick of cocaine weighing 976 grams, a light fixture containing 4.03 kilograms of fentanyl and two GPS trackers, and a ceiling fan box, which contained 3.02 kilograms of fentanyl and two GPS trackers. *Id.* at 3.

## B. Initial stop and search

On May 18, 2023, law enforcement surveillance units followed Cordova and Calderon, after they crossed the border from Mexico into the United States. Mot. 1 at 1-2; Opp'n 1 at 1-3. The officers observed Cordova and Calderon drive to a shopping complex, go into Victoria's Secret, and come out with bags they placed in the car. Mot. 1 at 2. The officers then lost sight of the vehicle, and relocated it parked near an H&M store where they observed the couple return to the vehicle, and saw Cordova retrieve something from the back seat. *Id.* The officers then saw Defendant park in front of the vehicle, and saw Cardova hand Defendant a red, reusable shopping bag. *Id.* When Defendant drove away, surveillance units followed him. *Id.*

After the surveillance units allegedly witnessed Defendant make an unsafe right turn, San Diego Police Officers B. Navarro ("Officer Navarro") and Officer A. Vital ("Officer Vital") initiated a traffic stop on Defendant for violation of California Vehicle Code section 21950(a) – Failure to Yield to a Pedestrian. *Id.* Defendant pulled over. Id.

Officer Navarro initially told Defendant that the reason for the stop was that his car was missing a front license plate. Mot. 1, Exh. B, OD-MEDIA-000250 ("Officer Navarro BWC 1") at 3:35. Officer Navarro then walked around the front of the vehicle, where the front plate was visible on her body-worn camera. *Id.* at 3:46. Officer Vital told Defendant that he was being stopped because they had received reports that Defendant failed to use his blinker and almost hit some kids, and because his third brake light was out and his window was slightly tinted. Mot. 1, Exh. A, OD-MEDIA-000003 ("Officer Vital BWC 1") at 3:44. Defendant gave his driver's license and insurance to Officer Vital, who returned to his squad car. Mot. 1 at 3. In his squad car, Officer Vital contacted Detective-Sergeant Oscar Amado ("Det. Amado"), who requested that Officer Vital seek consent for a search of Defendant's vehicle. Opp'n 1 at 5.

Officer Vital again approached Defendant, and the following exchange occurred:

Officer Vital: Hey boss. You cool if I just search your car and make sure there's nothing illegal in it?

24-cr-02430-JES-9

Defendant: No, yeah, sure.
Officer Vital: It's all good?
Defendant: Yeah, it's all good.
Officer Vital: Okay, go ahead and step out. I'm not going to put you in cuffs, I'm just gonna pat you down, okay?
Defendant: Okay, is there a reason?
Officer Vital: I'm just asking.
Defendant: Ah, okay.
Officer Vital: Yeah, just, I'm asking only.
Defendant: Ok, so I go outside or?
Officer Vital: Yeah, I'm going to have you step outside the car.
Defendant: Ok.
Officer Navarro: And he's just going to pat you down for weapons, ok?
Officer Vital: I'm going to pat you down. I'm not going to put you in handcuffs and then you can hang out with my partner over there.

Mot 1, Exh. D, OD-MEDIA-000002 ("Officer Vital BWC 3") at 1:15-1:41. Defendant then left the vehicle, and was asked to stand next to Officer Navarro while Officer Vital searched the vehicle. Mot. 1 at 4.

During his search of the car, Officer Vital found narcotics in a backpack. *Id.* Officer Vital then approached Defendant, told him to put his hands behind his back, handcuffed him, and patted him down. *Id.* Defendant asked, "What happened, is there a problem?" Mot. 1, Exh. C, OD-MEDIA-000001 (1) ("Officer Vital BWC 2") at 5:40-6:09. Officer Vital did not answer, and went back to search the vehicle further while Officer Navarro took down Defendant's information. Mot. 1 at 4.

Officer Vital then asked Defendant if everything in the car belonged to him, including "the bag." *Id.* Defendant responded that the bag was not his, and that a friend had given it to him at Plaza Las Americas (shopping center). *Id.* Defendant asked whether there was something wrong with his insurance or tail light, and Officer Vital responded that the arrest was separate from the insurance or the light. *Id.* Officer Navarro asked Defendant how long he had known Cordova, how he knew him, Cordova's phone number and address, and whether Defendant had seen him earlier that day. *Id.* Officer Vital then returned and told Defendant he was under arrest for the narcotics in his backpack. *Id.* at 5. When

24-cr-02430-JES-9

Defendant asked more, Officer Vital responded, "So if you want to talk to anyone, we're going to have to read you your rights. Detectives might want to talk to you to give your side. We have to read you your rights, and it's your choice if you want to talk to them." Officer Vital BWC 2 at 30:00.

### C. Police station interview

Defendant was subsequently transported to a police station, where he was interviewed by Special Agent Donibar Vargas ("SA Vargas") and Task Force Officer Scott Henderson ("Officer Henderson"). Mot. 1 at 5. Before the interview began, SA Vargas asked Defendant if he spoke "good English," and Defendant responded, "ehh." Mot. 1, Exh. E at 1. SA Vargas used both English and Spanish during the interview. Mot. 1 at 5. Defendant asked for clarification in Spanish multiple times during the interview and requested that his rights be read in Spanish. *Id*.; *id.* Exh. E at 12, 29, 59, 5.

SA Vargas asked Defendant about his relationship with Cordova. Mot. 1 at 5. SA Vargas told Defendant he could be "on the hook" with the cartel for the missing drugs, and that his friend "did him dirty." *Id.* SA Vargas also stated that law enforcement would "go another route" and it would "get really ugly" if Defendant did not confess. *Id.* Officer Henderson stated that if Defendant was not honest, they would go to the prosecutor and call Defendant "a fucking crook." *Id.* at 6. Officer Henderson continued to attempt to elicit a confession with similar statements about his and SA Vargas' potential negative statements to a prosecutor about Defendant. *Id.*

SA Vargas then read Mendez a consent to search form in Spanish, and asked for consent to search two phones Mendez had at arrest. *Id.* Mendez said, "I would like to talk to a lawyer to see if it is possible or not." Exh. E at 24. SA Vargas said, "Ok. So what is going to happen…" and then Defendant said, "But no, I have no problem. I would just like to consult with him." *Id.* SA Vargas responded, "Ok. So, I'm going to… the phones, let's clarify something, you're not going to let me register the phones?" Defendant hesitated, then, after more back and forth, Defendant said, "Well, I'll leave it, this, check it without a problem, I authorize." *Id.* at 25. SA Vargas asked, "Do you authorize yes or no?" and

24-cr-02430-JES-9

Defendant responded, "Yes, it's okay, yes, because I tell you, I didn't know, but yes, I authorize, yes." *Id.* SA Vargas followed up further, again reading the form, and asked, "I haven't forced you or threatened you to search these phones correct?" *Id.* at 26. Defendant said, "Correct." *Id.* Defendant then initialed the form, and gave the passcode for the locked phone. *Id.* At the end of the interview, SA Vargas offered Defendant his phone number. *Id.* at 70.

Defendant states that at the end of the interview, SA Vargas told him SA Vargas had arranged for state charges against him to be dropped, and instructed Defendant to contact him immediately upon his release from county jail to keep cooperating. Mot. 2 at 1-2. Defendant states that SA Vargas said not to flee, or he would be found whether in the U.S. or Mexico. *Id.* at 2. Defendant states that when he was later processed and told there were no charges against him, he interpreted this as confirmation that SA Vargas had told the truth, and that his continued cooperation was a requirement to avoid state charges being refiled which would return him to jail. *Id.*

**D. Conversation in SA Vargas' vehicle**

Defendant contacted SA Vargas after his release, and the two met at a Starbucks in Otay Mesa. *Id.* The two got into SA Vargas' vehicle, and SA Vargas drove them to a location 10 minutes away near the border. *Id.* Two more law enforcement agents got out of a truck that pulled up, and got into the back seat of SA Vargas' car. *Id.* The agents wore plain clothes and carried visible firearms. *Id.* SA Vargas placed a foldable blind over the windshield which blocked the view from the outside. *Id.*

In the vehicle, SA Vargas told Defendant that the federal charges, which would result in a longer sentence, could still proceed against him even though the state charges had been dropped. *Id.* SA Vargas stated that for that reason, they planned to sign Defendant up as a cooperating defendant, which would result in Defendant not doing time. *Id.* at 3. SA Vargas added that Defendant could take the case to trial, but would lose. *Id.*

Defendant read the cooperation agreement, then asked, "Can't a lawyer read this? Do I have a right to a lawyer?" *Id.* SA Vargas answered that he could not because charges

24-cr-02430-JES-9

were not pending, and said, "We don't go to lawyers for this. This is you. This is all on you." *Id.* He warned that he would seek an indictment if Defendant did not cooperate. *Id.* Another agent said, "What you need to think about is, like I told you the other day, you're young. How much time are you going to do? You've never been imprisoned, so you don't understand that yet." *Id.* SA Vargas told Defendant that the dealers would come after Defendant, and potentially kill him, due to his involvement to date. *Id.* SA Vargas said, "You don't understand how fucked you are." *Id.* at 4.

SA Vargas and the other agents continued questioning Defendant in the car, eliciting information regarding his connections to individuals, locations, and other information associated with their criminal investigation. *Id.*

**E. December 2024 Arrest and Interrogation**

On December 2, 2024, Defendant was arrested and interviewed. Mot. 1 at 7. The agents read him his *Miranda* rights in Spanish. *Id.* Defendant waived his *Miranda* rights and gave a statement. Opp'n 1 at 8.

### III.    DISCUSSION

Defendant moves to suppress the results of the search of the backpack in his car, his statements after arrest during the initial traffic stop, his statements at the police station, and his statements in SA Vargas' vehicle after his release. *See generally,* Mot. 1; Mot. 2. Defendant submitted a declaration in support of these motions. ECF No. 126-2 ("Decl. of Mendez"). The Court addresses each argument below.

**A. Initial Stop and Search**

**1. Consent Search of the Car**

Defendant argues that the search of his car was unconstitutional because it relied on his consent to statements and questions in English which he did not understand. Mot. 1 at 7-10. The Government argues Defendant's statements indicate that he did give knowing and voluntary consent for agents to search his car. Opp'n 1 at 8-12. The Government additionally argues that, even if Defendant did not consent to the search, the search was still proper under the automobile exception and the inevitable discovery rule. *Id.* at 12-15.

24-cr-02430-JES-9

Defendant responds that officers did not have probable cause to search his car, and that discovery of the narcotics in the vehicle was not inevitable. Reply 1 at 4-5. The Court finds that the consent search was proper.

While the government may rely upon consent to justify a search, it also bears the burden of showing that such consent was freely and voluntarily given and not the product of duress or coercion. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 248 (1973). The Ninth Circuit has identified five factors to determine whether consent was voluntarily given: "(1) whether the individual was in custody; (2) whether the arresting officer had their guns drawn; (3) whether *Miranda* warnings were given; (4) whether the individual was notified that they had the right not to consent; and (5) whether the individual was informed that a search warrant could be obtained." *United States v. Brown*, 563 F.3d 410, 415 (9th Cir. 2009). Courts in this Circuit have also considered the impact of language barriers in determining whether an individual has knowingly and voluntarily consented to a search. *See United States v. Gamez*, 301 F.3d 1138, 1144 (9th Cir. 2002) (considering factors related to language and cultural comprehension in determining whether a foreign national consented to a search); *United States v. Higareda-Santa Cruz*, 826 F. Supp. 355 (D. Or. 1993) (finding consent involuntary where defendant with a rudimentary grasp of English did not understand he could refuse officer's request for consent). Nonetheless, consent may be proper even when the person giving the consent is unaware of their right to refuse. *Schneckloth*, 412 U.S. at 234.

Here, the *Brown* factors weigh in favor of finding that Defendant's consent was voluntary. *See Brown*, 563 F.3d at 415. Defendant gave consent for officers to search his car during a traffic stop, where the officers' guns were not drawn. Officer Vital BWC 3 at 1:15-1:41. While Defendant was not given Miranda warnings, such warnings were not yet required because he was not in custody at the time he was asked for consent to search the car. *See id.* Defendant was not informed he could refuse consent, but Officer Vital did explain that he was "just asking" if Defendant would step out of the car. *See id.* And finally, the Officers did not mention the possibility of a search warrant.

Defendant correctly states that language and cultural barriers are part of the fact-specific inquiry into the validity of consent. Defendant attests that he misunderstood the officer asking whether he could search the car as asking if there was anything illegal in the car, and responded, "It's all good." Decl. of Mendez at 2. However, as the Government points out, the video shows Defendant saying, "No, yeah sure," which corresponds logically to the officer asking whether he could search the car. *See* Opp'n 1 at 10. Unlike in *Gamez*, Defendant is a United States citizen, not a foreign national, and attended three high schools in the United States starting his sophomore year. *See* 301 F.3d at 1144; Decl. of Mendez at 1-2. Further, unlike in *Higareda-Santa Cruz*, Defendant had not already been subjected to an illegal detention, and did not indicate difficulties understanding English at any point in the stop. *See* 826 F. Supp. at 357. The body worn camera footage shows that Defendant responded to questions in English and did not ask or attempt to communicate in Spanish at any point during the stop. *See generally*, Officer Navarro BWC; Officer Vital BWC. Thus, the Court does not find that Defendant's understanding of English and American policing norms was sufficiently impaired as to render his consent invalid.

In conclusion, the officers properly searched the car subject to Defendant's consent.[1] The motion to suppress the notebook and its contents is **DENIED**.

### 2. Post-Arrest Statements to Officer Vital and Officer Navarro

Defendant contends that officers violated his Fifth Amendment rights by eliciting incriminating information after handcuffing him without providing *Miranda* warnings. Mot. 1 at 10-11. The Government argues that Defendant was not in custody because the traffic stop was a *Terry* stop, not an arrest, and thus *Miranda* warnings were not required. Opp'n 1 at 17-18. The Court finds that Defendant was in custody after officers handcuffed him, and that his un-Mirandized statements must be suppressed.

An individual subjected to custodial interrogation must be apprised of his rights under *Miranda v. Arizona*. 384 U.S. 436, 444-45 (1966). The Supreme Court has defined

---

[1] Since the Court finds that officers lawfully searched the vehicle with Defendant's consent, the Court declines to address whether search fell under the automobile exception or the inevitable discovery rule.

24-cr-02430-JES-9

custodial interrogation as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 144. The "ultimate inquiry" in determining whether a person is in custody "is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *New York v. Quarles*, 467 U.S. 649, 655 (1984) (internal quotation omitted). Courts examine whether a reasonable person would conclude they could leave freely under the circumstances. *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1985). While police putting a person in handcuffs does not automatically convert a traffic stop into a custodial interrogation (*United States v. Bautista*, 684 F.2d 1286, 1289-90 (9th Cir. 1982)), the inherently restrictive nature of handcuffs weighs in favor of finding that a reasonable person would not feel free to leave. *USA v. Blanchard*, 752 F. Supp. 3d 1169, 1178 (N.D. Cal. 2024).

Here, Defendant was pulled over, asked to step out of his car, then handcuffed after Officer Vital searched his car and found narcotics. *See* Officer Vital BWC 3 at 1:15; Officer Vital BWC 2 at 5:10. Defendant correctly argues that a reasonable person would not have felt free to leave under these circumstances. Reply 1 at 6. The Government contends that Defendant was merely handcuffed during a *Terry* stop, highlighting that he was not confronted with the evidence of narcotics, and had not been forced out of his car. Opp'n 1 at 17-18. However, several factors show that Defendant would have felt less able to leave here than in a non-custodial *Terry* stop. Critically, Defendant was given multiple and changing reasons for the stop, and initially told by an officer "I'm not going to put you in cuffs." *See* Officer Navarro BWC 1 at 3:35, 4:12 (Officer Navarro telling Defendant he was being stopped for not having a front license plate then saying he did have one); Officer Vital BWC 1 at 4:12 (Officer Vital telling Defendant that he was stopped for failure to signal, a defective brake light, and a tinted window); Officer Vital BWC 3 at 1:15-1:41. Under those circumstances, a reasonable person in Defendant's shoes would have understood the handcuffs as a turning point in the interaction indicating they were no longer free to leave. *See Beraun-Panez*, 812 F.2d at 580.

24-cr-02430-JES-9

The Government also argues that Defendant was handcuffed for officer safety. *See* Opp'n 1 at 18. However, as Defendant points out, the record in this case does not show that Defendant posed a risk to the officers, and the cases cited by the government do not stand for the proposition that a handcuffed suspect is not under arrest when there is no evidence of danger or flight risk. *See Bautista*, 684 F.2d at 1290 (bank robbers seeming nervous and likely to run); *United States v. Patterson*, 648 F.2d 625, 633– 34 (9th Cir. 1981) (suspect not handcuffed). Thus, the handcuffs placed on Petitioner transformed his stop into a custodial situation.

Because Defendant was in custody, and the parties do not contest that he was asked incriminating questions, Defendant was improperly subjected to custodial interrogation without *Miranda* warnings. The motion to suppress Defendant's statements made to officers while handcuffed on the side of the road is therefore **GRANTED**.

### B. Police Station Interview

#### 1. *Seibert* Violation

Defendant argues that his answers during the interview at the police station should be suppressed because they were obtained through an impermissible two-step interrogation in violation of *Missouri v. Seibert*. Mot. 1 at 12. The Government argues that Seibert does not apply here, because any duplicative questioning was unintentional and the later *Miranda* warning was effective. Opp'n 1 at 18-20. The Court agrees.

"[A] trial court must suppress postwarning confessions obtained during a deliberate two-step interrogation where the midstream *Miranda* warning was objectively ineffective." *United States v. Williams*, 435 F.3d 1148, 1150 (9th Cir. 2006) (citing *Missouri v. Seibert*, 542 U.S. 600 (2004)). To determine whether a two-step interrogation was a deliberate ploy, courts look to subjective evidence of officer intent, and objective evidence like "the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and postwarning statements." *Id.* at 1158-59.

24-cr-02430-JES-9

Here, as analyzed above, Officer Vital and Officer Navarro improperly questioned Defendant during the roadside stop without *Miranda* warnings after placing him in custody. Then, 1.5 hours later and at a different location, SA Vargas gave Defendant *Miranda* warnings, and then questioned him about some of the same subject matter. *See* Mot. 1 at 13; Opp'n 1 at 19. Defendant argues that the fact that the interrogations were proximate in time and Officer Vital was directed to detain Defendant, and spoke on the phone with someone while doing so, show deliberateness. Mot. 1 at 12-13. However, as the Government points out, the questioning took place in two different settings, with different officers, and without evidence of subjective malintent by the officers. Opp'n 1 at 19. Further, the contents of both discussions show that the discussions overlap in part, but the questions asked at the roadside relate more readily to Defendant's initial arrest, while the questions at the station are broader and relate to the investigation as a whole. *See generally*, Officer Vital BWC 2; ECF No. 140-6. Thus, none of the relevant facts show that the officers deliberately subverted Defendant's *Miranda* rights with a two-step interrogation. *See Williams*, 435 F.3d at 1150. The motion to suppress Defendant's statements on the basis of a *Seibert* Violation is **DENIED**.

### 2. Right to Counsel

#### a. Invocation

Defendant argues that SA Vargas impermissibly continued to question him after he unequivocally invoked his right to counsel by saying that he would like to see and consult a lawyer. Mot. 1 at 13-14. The Government contends that the invocation of right to counsel was selective if effective at all, and limited in context to the decision to sign the consent form. Opp'n 1 at 22. The Court finds that Defendant selectively invoked his right to counsel as to the locked phone, and that the contents of the locked phone are subject to suppression.

In *Edwards v. Arizona*, the Supreme Court held that individuals in custody may not be subjected to further exchanges with police without an attorney present after they invoke the right to counsel. 451 U.S. 477, 484 (1981). The Court explained that "when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver

24-cr-02430-JES-9

of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.*

Since *Edwards*, officers must cease questioning when a suspect invokes his right to an attorney is one of the few "bright-line rule[s]" of modern Fourth Amendment law. *See Rodriguez v. McDonald*, 872 F.3d 908, 925 (9th Cir. 2017) (internal quotation omitted). Indeed, the request for a lawyer is given "even greater deference" than other *Miranda* rights like the decision to remain silent. *Id.* The purpose of the prophylactic *Edwards* rule is to prevent officers from "badgering a suspect" into waiving the right to counsel after it is asserted. *Davis v. United States*, 512 U.S. 452, 458 (1994).

Whether a suspect has invoked the right to counsel "is an objective inquiry, requiring some statement that can reasonably be construed to be an expression of a desire for an attorney's assistance." *Id.* In *Connecticut v. Barrett*, the Supreme Court held that if a suspect invokes the right to counsel but "ma[kes] clear his intentions" to invoke as to one area of questioning but not another, the police do not violate his rights by continuing to pursue other lines of questioning. 479 U.S. 523, 527 (1987). There, the suspect invoked his right to counsel in regard to making a written statement, but affirmatively clarified that he would be willing to make oral statements without a lawyer. *Id.* at 529. The Court explained that its decision should not be interpreted as "denigrat[ing] the settled approach to questions of waiver that requires us to give a broad, rather than a narrow, interpretation to a defendant's request for counsel." *Id.* (internal quotations omitted; cleaned up). Similarly, in *Michaels v. Davis*, the Ninth Circuit held that a defendant who affirmatively pointed to a particular question on a form and said he invoked his right to an attorney as to "that one" had selectively invoked his right to an attorney as to only that question. 51 F.4th 904, 920 (9th Cir. 2022).

Here, when faced with a consent form to search his phone and SA Vargas' statement that he could choose whether to sign, Defendant said, "I would like to speak with a lawyer to see if it is possible or not." ECF No. 126-1 at 24. Defendant correctly states that the first clause of the first statement is an unambiguous invocation of the right to counsel because

24-cr-02430-JES-9

it is a "statement that can reasonably be construed to be an expression of a desire for an attorney's assistance." Mot. 1 at 14; *Davis*, 512 U.S. at 458; *Shedelbower v. Estelle*, 885 F.2d 570, 571–73 (9th Cir. 1989) (finding that a defendant properly invoked the right to counsel by saying, "You know, I'm scared now. I think I should call an attorney.") This is supported by the fact that Defendant again said that he would like to consult with a lawyer moments later, after SA Vargas started to describe the process. ECF No. 126-1 at 24. In context, as the Government argues, it is clear that the "it" Defendant refers to is the form and the consent for the phone. *See id.* Defendant's statement "But no, I have no problem," before again clarifying that he would like to consult with an attorney is most clearly understood as a narrowing statement like those at issue in *Barrett* and *Michaels*, making clear that Defendant intended to invoke the right to counsel as to the form but did not have a problem speaking generally. *See id.*; *Barrett*, 479 U.S. at 525; *Michaels*, 51 F.4th at 920.

SA Vargas continued to ask Defendant to consent to the search of his phone after Defendant invoked the right to an attorney, resulting in the exact harm *Edwards* aimed to address. *See* ECF No. 126-1 at 24; *Davis*, 512 U.S. at 458. The motion to suppress Defendant's statements related to the search of his phone after he selectively invoked his right to counsel is **GRANTED.**

### b. Fruit of the Poisonous Tree

Defendant argues that the results of the search of his cellphone should be suppressed because his grant of consent to search the phone and his statement of the passcode were the result of the agents' denial of his right to counsel. Mot. 1 at 14. The Government argues that the contents of the cellphone are not subject to suppression under *Patane*, and that the discovery of the telephone evidence was inevitable. Opp'n 1 at 29-30. The Court finds that the contents of the locked phone are subject to suppression.

The physical fruits of *Miranda* violations are not subject to automatic suppression, but turn on the voluntariness of the statement involved. *United States v. Patane*, 542 U.S. 630, 643-44 (2004). "When assessing the voluntariness of an admission, we consider 'the totality of all the surrounding circumstances—both the characteristics of the accused and

24-cr-02430-JES-9

the details of the interrogation.'" *Mickey v. Ayers*, 606 F.3d 1223, 1233 (9th Cir. 2010) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). As courts have repeatedly noted, the contents of cellphones are materially distinct from traditional physical evidence, such as the firearm in *Patane*, in that they contain large amounts of information amounting to "[t]he sum of an individual's private life." *Riley v. California*, 573 U.S. 373, 394 (2014).

Here, Defendant consented to the search of his phone and gave SA Vargas his passcode directly after asking for, and being denied, the opportunity to speak with an attorney. ECF No. 126-1 at 24-25. After SA Vargas ignored Defendant's invocation of his right to counsel, Defendant still equivocated about whether to consent to the search of his phones. *Id.* SA Vargas continued to push, insisting that he would get a search warrant for the phones regardless of Defendant's consent. *Id.* Defendant finally relented, apparently under the impression that he had to. *Id.* at 25-26 ("Well, then, to not have a problem, I authorize."). Under these circumstances, Defendant's consent to search his phone and admission of his passcode were not the result of a reasoned decision, or the product of carelessness, but the result of repeated pressure and the sense that his consent did not matter. *See United States v. Booker*, 561 F. Supp. 3d 924, 941 (S.D. Cal. 2021) (finding the same where officers denied the right to counsel and then told a defendant to place his phone on the table before typing in his password).

Further, the Government has not shown that discovery of the contents of the locked cellphone was inevitable. *See* Opp'n 1 at 30. Illegally obtained evidence is admissible when the government shows by a preponderance of the evidence that its discovery was inevitable through lawful means. *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396 (9th Cir. 1989). Here, the Government asserts that it would have sought and obtained a warrant to search the cellphones even if Defendant had not consented and shared his passcode. Opp'n 1 at 30. However, the Government provides no evidence indicating it would have been able to access the information inside the locked cellphone without Defendant providing the passcode. *See Booker*, 561 F. Supp. 3d at 934-35 (explaining that the government must provide specific information regarding its ability to access information inside a locked

24-cr-02430-JES-9

phone to meet its burden under the inevitable discovery rule). Thus, as Defendant asserts, the Government has not met its burden to show inevitable discovery of the contents of the locked phone. Reply 1 at 30.

The motion to suppress the evidence from Defendant's locked phone is **GRANTED**.

### 3. Voluntariness

Defendant contends that his May 2023 confession was not voluntary because of the officers' coercive tactics in interviewing him. Mot. 1 at 15. Respondents disagree, as does the Court. *See* Opp'n 1 at 24.

Whether a confession is voluntary turns on whether a defendant's will was overborne, taking into consideration "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434 (2000). Courts are to exercise "close scrutiny of the facts of individual cases," such as "[t]he length of questioning, the use of fear to break a suspect, [and] the youth of the accused." *Gallegos v. Colorado*, 370 U.S. 49, 52 (1962). In psychological coercion cases, the Ninth Circuit has upheld the voluntariness of confessions in cases where officers informed the suspect of the potential for jail time. *United States v. Bautista-Avila*, 6 F.3d 1360, 1364-65 (9th Cir. 1993). The Ninth Circuit has emphasized that officers are entitled to use a variety of techniques to encourage suspects to tell the truth, understanding that those accused of crimes do not willingly confess to crimes absent successful persuasive tactics in interrogations. *See Doody v. Ryan*, 649 F.3d 986, 1021 (9th Cir. 2011).

Here, Defendant's 2023 confession was part of a relatively short interview of 2.5 hours, where the agents wore plain clothes and did not yell or threaten violence. *See* Opp'n 1 at 24. Defendant argues that his confession was nonetheless involuntary because of the statements the agents made about the potential legal and personal consequences of his actions. Mot. 1 at 16. Defendant states in his declaration that those statements made him afraid and led him to make statements he would not otherwise have made. Decl. of Mendez at 1. However, as the Government highlights, the statements were in the context of

skepticism about Defendant's story based upon facts known to all parties to be true: Defendant was indeed arrested with a significant amount of narcotics in his car, which had a high value to those from whom he had gotten them, which discredited his statements about being a blind mule. *See* Opp'n 1 at 25-26; *Amaya-Ruiz v. Stewart,* 121 F.3d 486, 494 (9th Cir. 1997) (encouragement to tell the truth does not amount to coercion). In *United States v. Bautista-Avila*, the Ninth Circuit held that an officer's statements that a court might consider a suspect's cooperation favorably and a statement reciting the potential legal consequences of a charge were acceptable forms of law enforcement persuasion. 6 F.3d 1360, 1364 (9th Cir. 1993). Like the statements in *Bautista-Avila*, the statements here did not rise to the level of coercion in violation of the Fifth Amendment despite their effect of causing Defendant to feel fear. *Id.* at 1364-65. Under the totality of the circumstances in this case, the Court does not find that Defendant's will was overborn in regards to the May 2023 confession. The Court thus **DENIES** the motion to suppress those statements on that basis.

### C. Conversation in SA Vargas' Car

#### 1. Voluntariness

Defendant argues that his statements in SA Vargas' car should be suppressed because the agents used coercive tactics which overbore his will in violation of due process. Mot. 2 at 5. The Government argues that the agents' conduct did not rise to the level of coercion. Opp'n 2 at 4.

As explained above, the test for voluntariness of confessions is whether the suspect's will was overborne, considering the suspect's characteristics and the circumstances of the case. *See Gallegos*, 370 U.S. at 52. "An interrogating agent's promise to inform the government prosecutor about a suspect's cooperation does not render a subsequent statement involuntary, even when it is accompanied by a promise to recommend leniency or by speculation that cooperation will have a positive effect." *United States v. Leon Guerrero*, 847 F.2d 1363, 1366 (9th Cir. 1988). Similarly, an officer's statements that a court might consider a suspect's cooperation favorably and a statement reciting the

24-cr-02430-JES-9

potential legal consequences of a charge were acceptable forms of law enforcement persuasion. *Bautista-Avila*, 6 F.3d at 1364. The court similarly found that statements regarding the strength of the United States judicial system, even coupled with promises of leniency and statements about potential charges, were not compelling enough to overbear an individual's will. *Id.*

Here, Defendant points to his youth, his imperfect English language skills, the relative isolation of the car, and the agents' persuasive tactics as evidence that his confession was involuntary. Mot. 2 at 4-6. He argues that the agents put improper pressure on him to cooperate by telling him he was in legal jeopardy and bringing up potential cartel retribution. *Id.* at 5-6. However, as the Government points out, Defendant's arguments are undermined by the fact that Defendant both initiated and terminated the meeting, which lasted less than an hour. Opp'n 2 at 4. The agents' statements about the potential legal consequences of Defendant's actions were of the same persuasive character as those at issue in *Bautista-Aliva*, regarding the quantity of drugs, strength of the evidence, and the potential penalties of the crimes at issue. *See* 6 F.3d at 1364-65 (agent informing suspect of potential penalty of crime and emphasizing the strength of the U.S. legal system); *c.f.* ECF No. 165-2 at 18 (SA Vargas telling Defendant he could "take it down to the court, but you're gonna lose. Cause we got you… with one kilogram of cocaine and one kilogram of heroin, and you were driving."). Further, the agents continuously emphasized Defendant's agency in choosing whether to cooperate or not. *See* Opp'n 2 at 6 (collecting four instances of agents telling Defendant he did not have to consent to cooperate). The Government also correctly points out that the agents' statements about the risk Defendant could be harmed by the cartel were in response to Defendant raising concerns about cooperation, undermining the argument that those statements were intended as psychological manipulation. *Id.*, Mot. 1 at 5-6. Thus, even considering Defendant's youth and the potentially intimidating atmosphere of the car, the agents' persuasive statements regarding the risks and benefits of the choices before him did not cross the line into coercion. The

24-cr-02430-JES-9

Court **DENIES** the motion to suppress Defendants statements in the car on the basis of voluntariness.

### 2. Threat to Prosecute

Defendant also argues that the agents violated his Fifth Amendment right to be silent by saying that they would "talk to [the] prosecutor to indict" him if he did not cooperate. Mot. 2 at 6; ECF No. 165-2 at 21. Mot. 2 at 6. The Court agrees.

Defendant's argument relies on *United States v. Harrison*, where the Ninth Circuit held that suppression was proper where an officer implied to the defendant that he would tell a judge she did not cooperate, which would harm her case. 34 F.3d 866 (9th Cir. 1994). There, the Ninth Circuit held that "there are no circumstances in which law enforcement officers may suggest that a suspect's exercise of the right to remain silent may result in harsher treatment by a court or prosecutor." *Harrison*, 34 F.3d at 891-92. The court contrasted its holding with the settled premise that "the police generally may offer to tell the prosecutor about the defendant's cooperation and suggest that cooperation may increase the likelihood of a more lenient sentence." *Id.* at 891. The Ninth Circuit upheld this "bright-line rule" in *Tobias v. Arteaga*, clarifying again that even a single statement "threatening that a suspect will receive less favorable treatment for exercising his rights is so coercive that it always risks overcoming the will of the run-of-the-mill suspect." 955 F.3d 571, 582 (9th Cir. 2021) (internal quotations omitted, cleaned up).

Here, the agent said, "eventually, we're going to wrap this case up and if you're not cooperating with us… again, this is not a threat. If you're not- it's just something- it's a fact. I'm gonna talk to my prosecutor so we can indict you." ECF No. 165-2 at 21. The core assertion that "if you're not cooperating with us, […] I'm going to talk to my prosecutor so we can indict you," is a statement that Defendant's decision not to cooperate may result in harsher treatment by a prosecutor—exactly the statement the Ninth Circuit held impermissible in *Harrison*. *See id.*; 34 F.3d at 891-92. The agent's assertion that the statement was not a threat does not change the message, and indeed would cause a reasonable person to wonder if they were being threatened.

The Government argues that the facts of this case are distinct from *Harrison* because Defendant was not in custody, and because the agent made a variety of other permissible statements regarding the potential benefits of cooperation. Opp'n 2 at 7-8. However, the reasoning of *Harrison* does not rely upon the suspect being in custody, but rather on the inherently coercive nature of threatening prosecution in retaliation for a person exercising their rights. *See Harrison*, 34 F.3d at 891-92.

The agent's statement that he would talk to the prosecutor to indict Defendant if he did not cooperate was therefore improper and, under *Harrison*, the Government cannot meet its burden to show that Defendant decided of his own free will to give the statements after that threat. *See* ECF No. 165-2 at 21; 34 F.3d at 891-92. The motion to suppress Defendant's statements made in SA Vargas' car after that threat is therefore **GRANTED**.

### 3. *Miranda* Warnings

Defendant also argues that his Fifth Amendment rights were violated because he was subjected to custodial interrogation without *Miranda* warnings. Mot. 2 at 7. The Government argues that Defendant was not in custody, so *Miranda* did not apply. Opp'n 2 at 8. The Court agrees.

As explained above, officers must give suspects *Miranda* warnings before subjecting them to custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966). An individual is in custody when there is a "formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1124 (1983). Courts use five factors to determine whether an individual was in custody: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *United States v. Kim*, 292 F.3d 969, 973-74 (9th Cir. 2002).

Here, Defendant voluntarily agreed to meet with SA Vargas and initiated contact by calling SA Vargas' phone, which weighs significantly in favor of finding he was not in custody. *See* Mot. 2 at 7; Opp'n 1 at 9-10; *c.f. Kim*, 292 F.3d at 974 (highlighting the

24-cr-02430-JES-9

"critical distinction" between voluntarily meeting police and meeting police unexpectedly). Defendant was confronted with evidence of guilt through the agents' statements about his culpability, but was not in a physical surrounding typical of interrogation because he was in a car on the side of a public road. *See* Opp'n 2 at 11. The meeting lasted less than an hour, and the agents repeatedly stated that Defendant did not have to cooperate. *Id.* at 13. The factors thus weigh in favor of finding that Defendant was not in custody during the meeting in the car. *See Kim*, 292 F.3d at 973-74. Further, Defendant eventually declined to cooperate, and the agents drove him back to where they had met. *Id.*

Defendant argues that he did not willingly initiate contact because he believed that he had to contact SA Vargas, based on his previous conversations with the agent and his earlier release. Reply 2 at 2. However, even crediting that assertion, the other factors and the agents' repeated affirmations of Defendant's choice in whether to cooperate weigh in favor of finding Defendant was not in custody during his questioning in the vehicle. The officers were not required to give Defendant *Miranda* warnings before speaking to him in the vehicle after he reached out to them. The motion to suppress on those grounds is therefore **DENIED**.

### 4. Right to Counsel

Defendant argues that his right to counsel was violated after he asked if lawyers could read the cooperation form. Opp'n 2 at 9. Because the Court finds that Defendant was not in custody in the car, the right to counsel did not attach. *See United States v. Hines*, 963 F.2d 255, 256 (9th Cir. 1992) ("It is well established, however, that the Fifth Amendment right to counsel under Miranda does not vest until a defendant is taken into custody.") The motion to suppress Defendant's statements due to his questions about lawyers is thus **DENIED**.

### 5. December 2024 Confession

Defendant argues that his statements during his second interrogation in December 2024 should also be suppressed, because they were given under the false assumption that he would not be provided counsel and following a series of coercive policing tactics. Mot.

24-cr-02430-JES-9

1 at 14. However, as the Government asserts, the circumstances of the December 2024 interrogation show that Defendant's statements were voluntary, curing the earlier Fifth Amendment violation as to the December 2024 confession.

When officers fail to honor a suspect's invocation of the right to counsel, statements made in later interrogations may also be subject to suppression if the prior denial leads the suspect to believe that invoking the right again would be futile. *U.S. v. Womack*, 542 F.2d 1047, 1051 (9th Cir. 1976). However, previous *Miranda* violations may be cured by a showing that a subsequent statement was knowingly and voluntarily made. *Oregon v. Elstad*, 470 U.S. 298, 309 (1985). "When a prior statement is actually coerced, the time that passes between confessions, the change in place of interrogations, and the change in identity of the interrogators all bear on whether that coercion has carried over into the second confession." *Id.* at 310.

Here, the Government states, and Defendant does not contest thatDefendant was read his *Miranda* rights at his December 2024 interrogation, and that he waived them and gave a statement. Opp'n 1 at 8. The influence of the officers' prior violation of Defendant's right to counsel was also alleviated by the passage of more than a year since his last interview and the fact that the interviews occurred at different stationhouses. *See Elstad*, 470 U.S. at 310 (1985). The *Elstad* factors thus weigh in favor of finding that the December 2024 statement was voluntary, absent other specific facts showing that it was not. *See id.*

Defendant does not make specific arguments regarding impermissible tactics used at the December 2024 interrogation, but argues that the agents' tactics over the course of his arrests and interrogations were so coercive that they overbore Defendant's will and rendered his statement involuntary. Reply 1 at 11. However, as explained above, the agents' tactics largely fell within the range of permissible policing. Thus, because the taint of the initial right to counsel violation had dissipated, Defendant's December 2024 waiver of his Miranda rights was effective and his statement was voluntary. The motion to suppress Defendant's December 2024 statement is therefore **DENIED**.

IV.   **CONCLUSION**

22

24-cr-02430-JES-9

For the reasons stated above, the Court **GRANTS** Defendant's motion to suppress: (1) his un-Mirandized statements to officers while handcuffed on the side of the road; (2) his statements regarding his cellphone during the May 2023 stationhouse interview after he selectively invoked his right to counsel regarding the phone; (3) the contents of Defendant's locked phone; and (4) Defendant's statements made in SA Vargas' car after Vargas threatened to talk to the prosecutor to indict him if he exercised his right to silence. The Court **DENIES** the remaining grounds for suppression.

  **IT IS SO ORDERED**.

Dated:  April 15, 2026

Honorable James E. Simmons Jr.
United States District Judge

24-cr-02430-JES-9